**Joanne NARTOWICZ, et al., Plaintiffs-Appellees,**

v.

**CLAYTON COUNTY SCHOOL DISTRICT, et al., Defendants-Appellants.**

No. 83–8115.

United States Court of Appeals, Eleventh Circuit.

July 17, 1984.

Larry A. Foster, Jonesboro, Ga., Edward McGlynn Gaffney, Jr., Notre Dame, Ind., for defendants-appellants.

Gary P. Bunch, Atlanta, Ga., for plaintiffs-appellees.

Keith Wiener, Atlanta, Ga., for amicus curiae American Jewish Congress.

Before HILL and CLARK, Circuit Judges, and LYNNE *, District Judge.

PER CURIAM:

The defendant, Clayton County School District, appeals to this court from an order of the District Court for the Northern District of Georgia, granting the plaintiff Nartowicz's motion for a preliminary injunction.

In January of 1983, the plaintiffs commenced an action in federal district court, pursuant to 42 U.S.C. § 1983, alleging that certain of the school district's practices contributed to the establishment of religion, in contravention of the first amendment to the United States Constitution. Specifically, the plaintiffs sought to enjoin the defendants from: (1) permitting a Youth For Christ Club or any other religious student group to meet on school premises under faculty supervision; (2) authorizing announcements of church sponsored activities by means of the schools' public address systems and bulletin boards; (3) permitting the placing of religious signs on school property; and (4) authorizing student assemblies that promote or advance religion. The district court granted the plaintiffs' motion for a preliminary injunc-

---

* Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

tion with respect to all four practices at issue, and defendant appeals from the injunction as it applies to the first two practices.[1]

We note at the outset that the scope of our review of a district court's order granting a preliminary injunction is limited:

The grant or denial of a preliminary injunction is a decision within the sound discretion of the district court. [citation omitted]. On appeal from the grant or denial of a preliminary injunction we do not review the intrinsic merits of the case. "It is the function of the trial court to exercise its discretion in deciding upon and delicately balancing the equities of the parties involved." [citations omitted]. We consider the court's decision under the abuse of discretion standard of review.

The court must exercise its discretion in light of the following four prerequisites for a preliminary injunction: "(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest." [citation omitted]. Because a preliminary injunction is "an extraordinary and drastic remedy," its grant is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion. [citation omitted].

*United States v. Lambert*, 695 F.2d 536, 539 (11th Cir.1983). Neither party questions the district court's conclusion that in the context of this case, the propriety of issuing the preliminary injunction hinges upon the likelihood that plaintiffs will prevail on the merits; if such a likelihood is substantial, the remaining three considerations will favor the plaintiffs, and if suc-

---

1. The school district concedes that it may not authorize religion promoting assemblies, and has discontinued its practice of placing allegedly religious signs on school property.

cess on the merits is unlikely, the plaintiffs have failed to carry their burden of persuasion.

Turning then to the likelihood of plaintiffs' success on the merits, allegations of establishment clause violations are evaluated with reference to a three part test articulated in *Lemon v. Kurtzman:*

1) Does the policy or practice of the state or state entity have a secular (non-religious) purpose?

2) Is the primary effect of the policy or practice one that neither advances nor inhibits religion?

3) Does the policy or practice avoid excessive entanglement with religion?

403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, 755 (1971). If the answer to any one of the above three questions is "no," an establishment clause violation has been made out. *Id.* Here, the plaintiffs assail two of the school district's practices as contravening the establishment clause: permitting a student group called "Youth For Christ" to meet on school property after school hours under faculty supervision; and using the school's public address system and bulletin boards to announce events sponsored by local religious organizations.

### The Youth For Christ Group

The affidavits, depositions and pretrial testimony to date reveal that there has been a "Youth For Christ" (YFC) group at North Clayton Junior High School for over eleven years. (T. v.I at 90). Meetings of the YFC are conducted after school hours on school property, and are supervised by a faculty sponsor. (T. v.I at 89). A "devotion" is read at each meeting, and there is "no praying at a majority of the meetings." (T. v.I at 89).

The district court held that permitting the YFC to meet violated the first factor of the *Lemon* test requiring that the state practice have a secular purpose, because the YFC was a non-secular or religious group. The court did not address the two remaining *Lemon* factors. This analysis may construe the secular purpose require-

ment too strictly. In *Widmar v. Vincent,* the Supreme Court held that permitting a concededly religious group to meet on public university property would not violate the establishment clause. 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). The Court noted that the secular purpose in allowing such meetings would be to further the university's policy of providing a forum in which students can exchange ideas. *Id.* at 275 n. 10.

Similarly, it has been held that there is a secular purpose in high schools encouraging extracurricular activities, a purpose that is made no less secular by the fact that one of the activities permitted is of a religious nature. *Brandon v. Board of Education of Guilderland Central School District,* 635 F.2d 971, 978 (2d Cir.1980); *Bender v. Williamsport Area School District,* 563 F.Supp. 697, 709 (M.D.Pa.1983); *cf. Lubbock Civil Liberties Union v. Lubbock Independent School District,* 669 F.2d 1038, 1044–45 (5th Cir.1982) (secular purpose requirement violated where the school district expressly authorized students to assemble after school for religious purposes). The meager evidence presently in the record makes it impossible to speculate as to whether the YFC was introduced for the purpose of advancing religion, as opposed to the secular purpose of encouraging extracurricular activity; final resolution of this issue must await further development of relevant facts upon remand.

The second component of the *Lemon* test calls for an inquiry into whether the junior high school's practice of permitting the YFC to meet on school property under faculty supervision has a primary secular effect of accommodating, rather than advancing or promoting religion. There are three pieces of evidence in the record pertaining to the YFC: First, there is an affidavit of the YFC faculty sponsor, indicating that YFC meetings take place after school, that a "devotion" is read at each meeting, that there is no praying at a majority of the meetings, and that there is no preaching or witnessing at any of the meetings. Second, there is an affidavit of the assistant

principal at North Clayton Junior High School indicating that the YFC has been in the school for eleven years. Finally, there is the testimony of the assistant principal indicating that, as with other extracurricular clubs at the school, she schedules the meeting times for the clubs, and announces the schedule over the school's public address system.

When the evidence above is evaluated in light of the district's apparent support of religious assemblies, religious signs, and announcements of church sponsored activities via bulletin boards and public address systems (discussed below), we are unable to conclude that the district court abused its discretion in issuing the preliminary injunction.[2] We add, however, that upon submission for final injunctive relief it would be useful to explore more fully several avenues of inquiry in determining the propriety of permanent relief. The ultimate question, of course, is whether the school district merely accommodates, as opposed to endorses, the YFC. In answering that question, it would be helpful to know: 1) to what extent faculty sponsors participate in YFC activities; 2) whether the school district has a policy of accommodating any group desiring space, and would freely extend access to any religious or anti-religious group, or whether before a group may meet on school property, it must first obtain school approval; 3) apart from what the school district has done to accommodate or support the YFC as a matter of fact, how is the school's position perceived by North Clayton Junior High School students, or put another way, to what extent does the impressionability of the students affect their perceptions of the school's actions?

*Announcement of Activities Sponsored by Religious Organizations*

The superintendent of the school district testified that it was his policy to permit various schools' public address systems and bulletin boards to be used by churches to announce church sponsored secular activities and other messages of "public importance." (T. v.3 at 90–91; T. v.1 at 87). The superintendent further observed that in order to ascertain whether a particular event that is the subject of a prospective announcement is secular in character, or of public importance, it may be necessary to make an inquiry into the nature of the event. (T. v.3 at 91). The district court found no written guidelines in existence to assist administrators at the various schools in determining which messages could properly be announced (T. v.1 at 192); consistent with that finding is the superintendent's statement in his affidavit that he had no knowledge of what kinds of announcements were in fact being authorized. (T. v.1 at 87).

The district court held that the policy and practice of announcing "secular" activities[3] sponsored by religious organizations created excessive entanglement problems. The court therefore issued a preliminary injunction against announcements of church sponsored activities through school facilities, but specifically exempted from the order secular activities taking place at a particular church, provided that the activities were not church sponsored.

We conclude that the court acted within its discretion in issuing the injunction as to such announcements. The excessive entanglement component of the *Lemon* test has been interpreted to mean that "some governmental activity that does not have an impermissible religious effect may nevertheless be unconstitutional, if in order to avoid the religious effect government must enter into an arrangement which requires it to monitor the activity." *Americans United for Separation of Church and State v. School District of the City of Grand Rapids*, 718 F.2d 1389, 1400 (6th

2. Because of our holding that adequate grounds exist to issue the injunction in light of the secular effect component of the *Lemon* test, we need not address questions of excessive entanglement, the third inquiry under *Lemon*.

3. Both parties agreed that the announcement of "religious" activities would be impermissible.

Cir.1983). Here, the defendants concede that the announcement of church sponsored religious activities would have the impermissible effect of advancing religion. It would appear from the evidence presently available that in order to avoid announcing religious activities school representatives must monitor and occasionally investigate the subject matter of proposed announcements, and sort out those church sponsored activities that are religious from those that are not, without the benefit of written policy guidelines. Under these circumstances, it was not an abuse of discretion to hold that there existed a substantial likelihood of entanglement.

AFFIRMED.