In the Matter of CONCRETE PROD-
UCTS, INC. (Chapter 11 Case
288–00540), Debtor.

William S. MINTER, Jr., William S.
Minter, III and B.E.
Bledsoe, Plaintiffs,

v.

The DIRECTORS OF CONCRETE
PRODUCTS, INC., Phil Newton, Janet
Brinson, James Whaley, George Ruehl-
ing and Harold Zell, Defendants.

Adv. No. 289–0001.

United States Bankruptcy Court,
S.D. Georgia,
Brunswick Division.

Jan. 27, 1989.

William E. Dillard, III, John M. Tatum, Savannah, Ga., for plaintiffs.

Gilbert C. McLemore, Jr., Brunswick, Ga., Marvin L. Pipkin, for defendants.

## MEMORANDUM AND ORDER ON APPLICATION FOR INTERLOCUTORY INJUNCTION

LAMAR W. DAVIS, Jr., Chief Judge.

Debtor's Chapter 11 case was filed on October 3, 1988. In the ensuing weeks, a series of events have transpired which demonstrate a fundamental dispute among certain shareholders and existing management of the company. The dispute resulted in a series of meetings of the shareholders culminating with the attempted ouster of the Debtor's president B.E. Bledsoe by the board and the subsequent filing of this adversary proceeding to enjoin the board from doing so. Based on the evidence obtained in a lengthy hearing over two days I make the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1) Bledsoe filed this adversary proceeding seeking a temporary and permanent injunction against the board prohibiting his dismissal. Alternatively he seeks the appointment of a Chapter 11 trustee to run the business.

2) Bledsoe is a graduate engineer with 30 years experience in the concrete business. In 1979 he was hired as president of Concrete Products, Inc., the Debtor (hereinafter CPI). Based on his recommendations to the then board of directors CPI restructured itself and became very profitable in the early 1980's. CPI manufactures two basic products: cement wood fiber roof decking and precast concrete roof decking. It has few competitors in the manufacture of these somewhat unique, specialized building products. However, competitive pressures forced CPI to sell its product, at

times, for an inadequate price to remain profitable. In the later 1980's profits vanished. In the first six months of 1988 CPI lost one million dollars. As a result, Bledsoe formulated and presented a business plan to the board to reverse the decline in the business (Exhibit P–5). The board approved the plan and in the final six months of 1988 the company showed a profit of $200,000.00 subject to a possible write-off of $150,000.00 in dated or obsolete inventory.

3) The chairman of the board of directors was Carley Zell. Carley Zell is a long time, highly successful businessman in the Brunswick area, having been involved in the independent insurance business, real estate development business, exterminating business and private water systems. He owned a substantial portion of CPI stock prior to the filing of this case. Over the years Bledsoe ran CPI, he and Carley Zell worked closely and harmoniously together. Bledsoe participated in the management of other companies owned by Carley Zell as well.

4) In 1985 the board of CPI under Carley Zell's leadership decided to enter a joint venture to be known as the Brunswick Free Trade Zone (hereinafter BFTZ). CPI owned 55% of the stock of BFTZ and Burch Williams owned 45% (Exhibit P–4). Bledsoe was elected to serve as president of BFTZ.

5) BFTZ, while it had great potential, became a serious drain on the resources of CPI. CPI was obligated on $1.5 million in debt of the BFTZ and had to fund 55% of the BFTZ monthly expenses of approximately $40,000.00.

6) Part of the business plan adopted in mid–1988 was to sell the 55% interest CPI held in the BFTZ, to relieve it of the monthly cash outlay and the longterm debt. Bledsoe sought purchasers of CPI's interest and ultimately reached an agreement in principal to sell the 55% to Burch Williams, owner of the remaining 45%.

7) At a shareholders meeting in November 1988 Harold Zell, Carley Zell's son, supported a slate of directors in opposition to the slate supported by Bledsoe. The make-up of the new board reflected a 3–2 split of Bledsoe-supported directors and Zell supported ones. On November 17, 1988, the new board by a 3–2 vote approved Burch Williams' offer to pay $400,000.00 for the 55% interest held by CPI, part in cash and part secured by an assignment of the BFTZ stock.

After the board approved the sale terms, Bledsoe worked toward consummating the contract which was ultimately executed on January 4, 1989 (Exhibit P–6). The terms of the final contract differed from that previously considered by the board, on advice of his counsel. The most significant change was that the unpaid balance of the purchase price of the BFTZ stock would be secured by an *un*recorded deed to secure debt covering BFTZ's property rather than by the stock assignment.

8) In the meantime, on November 29, 1988, at the urging of his son, Carley Zell had requested a second special meeting of the shareholders for December 12, 1988 (Exhibit P–12). Both Carley Zell and Bledsoe solicited proxies for that meeting. The proxy solicitation mailed by Zell included as purposes of the meeting the election of a new board and "to discuss various financial actions of the President." It contained attachments regarding a "Consulting Fee to President Bledsoe" excerpts of the bylaws governing the setting of compensation of officer/directors and a copy of a Georgia statute governing the actions of "Interested directors and officers." The clear implication of the solicitation was that Bledsoe was guilty of mismanagement or self-dealing. The evidence at trial, however, is to the contrary. The meeting was ultimately held on January 10, 1989 after litigation in the Superior Court of Glynn County.[1] At

1. *Carley Zell et al. v. The Directors of Concrete Products, Inc.* That action was filed after this Court declined to take jurisdiction over a "Motion for Restraining Order" filed in the underlying Chapter 11 Case Number 88–20540 on December 7, 1988. The Motion sought to enjoin the CPI board from holding a meeting to amend the bylaws of CPI. At an *ex parte* hearing on that Motion, I expressed concern over the jurisdiction of this Court to intervene in an internal

that meeting Harold Zell held proxies sufficient to elect a new board of directors and he did so. Bledsoe was one of the board members replaced. Harold Zell became chairman of the board.

9) The new board met January 16, 1989 and elected new officers for CPI, not including Bledsoe. However, no affirmative vote to fire Bledsoe was taken and although the board appointed Howard Zell president and George Ruehling executive vice president, Bledsoe's employment contract designated him as chief executive officer (Exhibit P–1), and it was not terminated.

10) Neither Harold Zell nor George Ruehling have any experience with the business operated by CPI. While both of them have extensive business experience, it is not as specialized as Bledsoe's. For a company which is involved in such a unique, specialized business as CPI, specialized leadership is essential.

11) Neither Zell nor Ruehling have any significant knowledge of

  a) the manufacturing process employed by CPI;

  b) the supply sources of CPI;

  c) the capabilities of remaining employees of CPI;

  d) the market areas served by CPI;

  e) the quality of competition against which CPI operates;

  f) the relative profitability of products manufactured by CPI;

  g) the production capability of the plant;

  h) the breakeven point of the company;

  i) the customer base of the company, or the history of business relationships with repeat customers.

12) Bledsoe is intimately familiar with all of the above and has earned the respect and loyalty of the staff and employees of CPI. He has been a key developer of the business strategy being pursued to turn CPI into a profitable entity again. He has ongoing relationships with many repeat customers of CPI.

13) While Bledsoe is not, ultimately, irreplaceable or indispensable, his departure would constitute a serious blow to continuity and stability of CPI at this critical juncture in its life. Bledsoe's departure would also trigger the departure of some long-time, key employees.

14) If Bledsoe is fired in contravention of his employment contract and if the company does fail, he would have an individual claim against CPI and/or its board. Moreover, the shareholders of CPI would conceivably have the right to assert a derivative action against the board members individually for the damage to CPI.

15) Although some question was raised about false or inadequate financial records being maintained by CPI at the time of previous shareholders or directors meetings, there is no evidence in the record now to suggest that such is the case.

## CONCLUSIONS OF LAW

The Plaintiff seeks to obtain a preliminary injunction from this Court which would enjoin the board of directors of the debtor corporation from terminating him as president of the debtor corporation. In part, the Plaintiff's request for the injunction rests upon allegations that the board of directors' action in seeking to fire him is a "clear abuse" of the power vested in the board, which would, if not enjoined, jeopardize the reorganization process. In determining whether to grant the Plaintiff's request for a preliminary injunction it is necessary to examine whether there exists:

  "(1) A substantial likelihood that plaintiff will prevail on the merits,

corporate dispute. The Movants were understandably concerned that litigating that case in state court might violate 11 U.S.C. Section 362 and I granted them relief from stay *instanter* to do so. Moreover, that action, filed as a motion was not in accord with Bankruptcy Rule 7001(7) which requires an adversary proceeding. Final-

ly, the jurisdictional basis for relief in this Court [*In re Johns–Manville Corp.*, 801 F.2d 60 (2nd Cir.1986) ] was not asserted at the prior hearing. Based on *Johns–Manville* I conclude that this Court does have jurisdiction, in a narrow set of circumstances, to intervene.

(2) A substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted,

(3) That the threat and injury to the plaintiff outweighs the threat and harm the injunction may do to defendant, and

(4) That granting the preliminary injunction will not disserve the public interest." [citation omitted]

Because a preliminary injunction is "an extraordinary and drastic remedy," its grant is the exception rather than the rule and Plaintiff must clearly carry the burden of persuasion. [citation omitted] *Nartowicz v. Clayton County School District*, 736 F.2d 646 (11th Cir.1984).

Under Georgia law, "[a]ny officer or agent elected or appointed by the board of directors may be removed by the board whenever, in its judgment, the best interest of the corporation will be served thereby". O.C.G.A. § 14–2–151(a). In an action by minority stockholders to enjoin the majority stockholders the Georgia Supreme Court stated:

"The acts planned by defendants may prove to be unwise, as plaintiffs think, but it is well settled that equity will not interfere to prevent unwise or unfounded acts or policies. [citation omitted] And it is equally well settled that the internal management of a corporation will not be interfered with at the instance of minority stockholders—unless the majority stockholders are acting without charter power, or *a strong case of mismanagement* or fraud is shown."

*Bryant Realty Corporation et al. v. Lorberbaum et al.*, 221 Ga. 820, 147 S.E.2d 420 (1966) (emphasis added). Also see: *Bush v. Bonner*, 156 Ga. 143, 118 S.E. 658 (1923); *Bartow Lumber Company v. Enwright*, 131 Ga. 329, 62 S.E. 233 (1908); cf. *In re Potter Instrument Company*, 593 F.2d 470, 475 (2nd Cir.1979) ("A bankruptcy court shall not lightly employ its equitable power to block an election of a new board of directors.")

The right of a board of directors to govern their corporation is a prerogative ordinarily uncompromised by reorganization.

Cf. *In re Johns–Manville Corp.*, 801 F.2d 60, 64 (2nd Cir.1986) (A shareholders right to govern their corporation is a prerogative ordinarily uncompromised by reorganization.) Where a strong case of mismanagement is shown, the Georgia courts have carved an exception out of the general rule that equity will not interfere with the internal management of a corporation. See *Bryant Realty, Bush*, and *Bartow Lumber, supra*. The Federal Courts have, likewise, carved out an exception to the corporate governance rule, where "clear abuse" can be shown. *Johns–Manville, supra*. The "clear abuse" standard adopted by the Second Circuit appears to be analogous to the "strong case of mismanagement" standard adopted by the Supreme Court of Georgia.

The shareholders intention to exercise their bargaining power to gain leverage in the reorganization process, without more, cannot be construed to be clear abuse. *Id.*, at 65. "Clear abuse" requires a showing that the board's action "demonstrate(s) a willingness to risk rehabilitation altogether." *Id.* at 65. The determination of whether the board has committed a "clear abuse" is a fact specific inquiry which analyzes the real risks posed to rehabilitation. "[T]he determination ... of clear abuse turns on whether rehabilitation will be *seriously threatened*, rather than merely delayed." *Id.* at 66 (emphasis added). While delay standing alone is not sufficient, delay combined with "real jeopardy to reorganization prospects" is sufficient. *Id.* at 67. A sounding of the "death knell" jeopardizing both the debtor's rehabilitation and the rights of creditors must be evident. *In re Potter Instrument Company, Inc., supra* at 475.

As applied to the facts in this case I conclude that Plaintiffs have made the requisite showing to grant relief on a preliminary basis. Based on all the evidence before me, there is a substantial likelihood that Plaintiffs will prevail on the merits at the final hearing. The solicitation by a substantial shareholder of proxies which implied, if it did not affirmatively state, that management was guilty of self-dealing

and financial irregularities and mismanagement was irregular if not abusive of the rights of management to make out a case for the proxies it was soliciting. This raises the distinct possibility that proxies delivered by some shareholders to Harold Zell were given based upon incomplete or misleading information. Once delivered, Mr. Zell used the proxies to oust the current board and replace it with his hand-picked candidates. Predictably, the board proceeded to elect new officers including Mr. Zell as president, and he attempted to fire Bledsoe. The actions of Harold Zell were not shown to have come after such degree of prior inquiry and open minded investigation as would compel a conclusion that he was acting in good faith and in accordance with the standard of conduct required of a corporate director. *See* O.C.G.A. § 14–2–152. *Comolli v. Comolli*, 241 Ga. 471, 246 S.E.2d 278 (1978). Neither has it been shown that his motives were malicious toward Bledsoe or other shareholders. He may have simply overreacted to incomplete information and acted precipitously. Nonetheless, there is enough evidence to find, as I do, that Plaintiffs have shown a substantial likelihood that his and the board's actions were abusive, or that they were so reckless as to constitute serious mismanagement which would seriously threaten the reorganization.

Turning to the second element, a substantial threat of irreparable injury has been made out. Bledsoe is a key man to the successful reorganization of CPI. Only he of all the officers, directors and shareholders has the requisite skill, knowledge, and leadership to guide CPI through this most difficult reorganization process. Were the company not in its present financial distress and were it not attempting massive changes in focus and direction to survive, businessmen of the demonstrated ability of Harold Zell, George Ruehling, Phil Newton and others might well be able to take over and guide the company. But these are not ordinary times for CPI and to change the day to day management, lose the expertise of Bledsoe and turn CPI over to an untested and marginally knowledgeable management team raises a clear and substantial threat of irreparable injury and a clear willingness by the board to risk successful reorganization of the business.

The third element has likewise been proven. The threat to Plaintiffs as minority shareholders, as well as the threat to employees and creditors of CPI who are much at risk if this reorganization fails and whose interest this Court must strive to protect far outweighs the possible harm to Defendants. This injunction does not and will not displace any management of CPI nor interfere with its doing business as usual on a day to day basis. The only possible damage to CPI is the additional salary obligation to Bledsoe but his worth easily offsets this relatively minor expense to a business of this size.

Finally, granting this relief will not disserve the public interest. Indeed, the public interest in preserving CPI as a viable business is better served by granting this injunction.

Since Plaintiffs have carried the burden of showing a substantial likelihood that they will prevail on the merits in showing that reorganization is seriously threatened by Bledsoe's possible ouster, a preliminary injunction should issue, in accordance with the authorities set forth above.

## ORDER

For these reasons I preliminarily enjoin Defendants from taking any action to terminate the employment of B.E. Bledsoe or diminishing his duties as chief executive officer of Concrete Products, Inc., as set forth in paragraph 4 of his employment contract (Exhibit P–1) until further order of this Court. The board, however, is not enjoined from otherwise acting and indeed continues to have the authority granted to it by Georgia law. See generally O.C.G.A. § 14–2–140. Bledsoe and the board jointly are responsible for fulfilling the duties of debtor-in-possession. See 11 U.S.C. §§ 1107, 1106, 704; Bankruptcy Rules 4002, 2015, 1007, X–1007. This Court well recognizes the potential difficulty of these parties operating harmoniously. However, all of them share in their fiduciary obli-

gations to Concrete Products, Inc., its shareholders and to this Court as persons in control of a debtor-in-possession. If they are unable to discharge that duty in harmony and in the best interest of all shareholders and creditors of Concrete Products, Inc., this Court will not hesitate to appoint an examiner or a trustee to mediate or to run the business. However, the additional expense and imposition of additional administrative burdens on Concrete Products, Inc., has not been shown to be either necessary or desirable at this point. I specifically reserve the right to appoint such examiner or trustee with or without notice to the parties should circumstances warrant. I have no doubt that Mr. Bledsoe and Mr. Zell have the ability to avoid that eventuality.

Accordingly, the parties are ORDERED AND DIRECTED to abide by the terms of this Order pending further order of this Court.