### In the Matter of CONCRETE PRODUCTS, INC., Debtor.

### Bankruptcy No. 88–20540.

United States Bankruptcy Court, S.D. Georgia, Brunswick Division.

July 2, 1996.

---

William S. Orange, III, Brunswick, GA, for Debtor.

Marvin L. Pipkin, Darien, GA, for Movant.

William E. Dillard, III, Savannah, GA, for B.E. Bledsoe.

---

## ORDER ON APPLICATION FOR ALLOWANCE OF ATTORNEY'S FEES BY MARVIN L. PIPKIN

LAMAR W. DAVIS, Jr., Chief Judge.

Debtor's attorney, Marvin L. Pipkin, filed the above application on April 2, 1996, and this Court scheduled the matter for a hearing in Brunswick, Georgia, on May 2, 1996. In the application Mr. Pipkin seeks compensation totalling $62,625.50 for professional services rendered to the Debtor, Concrete Products, Inc. (hereinafter "Debtor"), between November 6, 1990, and October 10, 1995. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## FINDINGS OF FACT

In his application, Mr. Pipkin sets forth the time spent in service of the Debtor during the years 1990–1995 at the rates of $85.00, $100.00, and $125.00 per hour. Mr. Pipkin has subdivided his work into six categories in the application as follows:

A. Bledsoe Litigation

B. Roof Deck Litigation

C. Georgia Port Authority Litigation

D. Walker Attorney Trustee Application

E. Preference Litigation

F. General and Administrative

For his services in all of the categories except for "Walker Attorney Trustee Application," this Court is satisfied that Mr. Pipkin has provided a substantial benefit to the Debtor and approves the requested fees. The United States Trustee (hereinafter "U.S. Trustee") raised an initial objection to the degree to which there has been a proper accounting for Mr. Pipkin's activities in the prosecution of preference litigation which recovered approximately $76,000.00. Because Mr. Pipkin testified that the time was actually spent and the recovery yielded a substantial return to the estate, I find this portion of his application to be compensable. With respect to the defense of adversary litigation, Debtor was involved in a dispute with Roof Decks in which a substantial counterclaim by Roof Decks was compromised on very favorable terms. In addition, Debtor became embroiled in an environmental/hazardous waste liability issue which again was settled on very favorable terms to the Debtor. In the absence of Mr. Pipkin's involvement in both of these matters I find that the estate would have suffered and that his services in these areas are compensable. Therefore, the remainder of this order will address the area of primary dispute, Mr. Pipkin's activities and the compensability of his representation of the Debtor in connection with the work done under the general heading "Walker Attorney Trustee Application."

Debtor originally filed for bankruptcy relief on October 3, 1988. At the time of filing

for bankruptcy relief, attorney William S. Orange, III, represented Debtor. Following the filing of the petition, several months of skirmishing between Debtor's board of directors and its president, B.E. Bledsoe, who also served as chief executive officer, ensued causing this Court to preliminarily enjoin the board from terminating Mr. Bledsoe's contract. *See Minter, et.al., v. Directors of Concrete Products, et.al.,* 110 B.R. 997 (Bankr. S.D.Ga.1989) (Davis, J.).[1] That situation proved unmanageable and on May 5, 1989, this Court appointed a Chapter 11 trustee to oversee the Debtor. This decision also spurred additional litigation for which Mr. Pipkin now requests reimbursement over the objections of the U.S. Trustee and B.E. Bledsoe.

Following the appointment of James D. Walker, Jr., as Chapter 11 Trustee (hereinafter "Trustee"), the intensity of the dispute between the Debtor's former management, B.E. Bledsoe, its new board of directors, led principally by Harold Zell, and the Trustee did not end. The Trustee operated the business for a period of approximately fifteen months, ultimately coming to the conclusion that the business could not be reorganized and needed to be liquidated. By letter dated August 27, 1990, Trustee, citing the profitability figures for late spring and early summer of 1990, withdrew his proposed Disclosure Statement and Plan and, instead, advised that the company would wind down its business. At that time Harold Zell had filed a second motion to remove the Trustee, this Court entered an Order on November 2, 1990, which denied the Motion to Remove, but concluded in relevant part as follows:

> The Trustee has now made clear to all interested parties his intention to let the company wind down operations and to thereafter file a Motion to Convert the case to a Chapter 7 case for liquidation.

> In view of the central reasons for the Trustee's appointment and the current posture of this case, I now conclude that

the Trustee has successfully fulfilled the essential purposes of his initial appointment. He did, in fact, maintain some degree of peace between warring factions so that the company could operate for a sufficient period of time to enable interested parties to decide whether it could be successfully reorganized. He did ultimately reach the conclusion that the company should be liquidated thus resolving the initial philosophical dispute between Bledsoe and the Board which formed the basis for so much of the acrimony early in this case.

> The Board now expresses a desire to reassume management of the company and attempt to liquidate it under the auspices of a Chapter 11 liquidation plan or possibly thereafter a Chapter 7 liquidation. The continuing expense that the estate will incur by the services of a Trustee as opposed to the services of its Board of Directors in an orderly Chapter 11 liquidation is no longer necessary. I conclude, therefore, that while the services of the Trustee have been of immense value to the Court, to the Debtor, and to creditors of the estate, the essential purpose for the services of a Chapter 11 Trustee in this case no longer exists. Accordingly, the Trustee is excused from any further responsibility in this Chapter 11 case, with profound thanks from the Court for his services.

> All matters of corporate governance are restored to the Board of Directors of Concrete Products, Inc., effective upon the date this Order becomes final. By separate order, the preliminary injunction issued in the related adversary proceeding will be vacated inasmuch as there are no remaining prospects for reorganization and the underlying reasons for entry of that preliminary injunction no longer exist.

In accordance with the language of this Order, all matters of corporate governance were restored to the Debtor's Board of Directors. Harold Zell, who previously had been elected Debtor's president on January

---

**1.** At the time, I concluded that based on the evidence available, the termination of Mr. Bledsoe, a longtime key employee of the corporation, by a newly elected Board of Directors in possible violation of a written contract of employment would seriously threaten the reorganization.

10, 1989, was re-elected by the remaining members of the board of directors to serve as president of the Debtor in liquidation.

On November 14, 1990, Marvin L. Pipkin filed a motion seeking appointment to serve as counsel to the Debtor and by Order of this Court he was appointed on December 20, 1990, *nunc pro tunc* November 2, 1990.[2] Mr. Pipkin has served in that capacity from that day through the present during which time he has been engaged in far-ranging and substantive efforts on behalf of the Debtor. Mr. Pipkin now seeks compensation for his time and efforts spent contesting the Trustee's fee application. Specifically, Mr. Pipkin on behalf of the Debtor objected, along with several unsecured creditors, to the Trustee's application and filed independent attacks seeking the disallowance of any fees or a surcharge against any fee award. *See Objection of Debtor to Application for Interim Compensation by Attorney for Former Trustee of Debtor,* Doc. No. 378, Jan. 7, 1991; *Response by Chicago Heights Steel, Inc., Hartford Casualty Insurance, Gifford–Hill & Company, and Polythane Systems, Inc. to Application for Professional Fees,* Doc. No. 461, Nov. 25, 1991; *Motion to Surcharge Trustee and Objection to Application for Trustee's Commissions filed by Debtor,* Doc. No. 469, Nov. 26, 1991.

Ultimately, this Court entered an Order on February 7, 1992, allowing certain compensation in behalf of Mr. Walker. That Order revealed:

Upon consideration of the Motion for Reconsideration and for an Emergency Hearing, I conducted a hearing by telephone conference on May 4, 1989, with all parties represented. The Board argued that the company should be immediately liquidated and represented that a plan to accomplish liquidation would be submitted. Bledsoe contended that the Board, which had failed to

file a Plan, should not be permitted to sabotage the Bledsoe plan by forcing a shutdown in operations. In my order of May 5, 1989, I concluded that the tension between the Board and Mr. Bledsoe worked to no one's benefit. The parties repeatedly presented to this Court issues that involved principally business judgments. I determined that this Court's role should not involve corporate governance and that, pending consideration of competing plans of Bledsoe and the Board, an "independent assessment of how the corporation should be operated is essential." I determined that I had no other alternative than to order appointment of a trustee. *Minter, supra,* # 89–2001 (May 5, 1989). The United States Trustee thereafter selected James D. Walker, Jr., who was approved for that appointment by order entered May 5, 1989. By Order dated June 1, 1989, Walker was appointed to serve as attorney for the Trustee as well.

On June 22, 1989, a Motion to Remove Trustee was filed by Carley Zell and denied by order entered August 29, 1989. On July 9, 1989, a Motion was filed to set aside the temporary restraining order preventing Bledsoe's termination. I ruled that the Motion was moot as the Trustee was operating the business and was vested with the right to make a decision on the issue of Bledsoe's employment.

Among the initial duties, but by no means the sole duty, of Mr. Walker as Trustee was the duty to improve the record keeping and accounting system of the Debtor to determine if the business should be continued or liquidated. On February 20, 1990, a continued hearing was held on the United States Trustee's Motion to Convert. Following a lengthy hearing I denied the Motion by an order dated February 27, 1990 (Document # 187). I concluded that on a cash basis the company's losses were marginal during the first nine

---

**2.** The application sought retroactive approval for a maximum of 10 hours services rendered from November 2, 1990, to "the date of the order on this application." (Doc.No.344). The order granting the application was signed December 20, 1990, and limited services between November 2 and December 5 (the date of the hearing) to 10 hours. In examining the application it seeks compensation for 15.6 hours of previous work. Accordingly, the application will be reduced by 5.6 hours.

months of the Trustee's stewardship. Since this was in stark contrast to the huge losses suffered in 1988 I concluded that there were not sufficient grounds for conversion under Section 1112(b) at that time. At that point in time both the Trustee and the Board had opposed conversion. I denied the Motion to Convert and ordered the Trustee to file a Disclosure Statement and Plan by March 15, 1990, or to file a statement explaining why he would not do so and making recommendations for dismissal or conversion. The Trustee filed a Disclosure Statement on March 15, 1990, and amended it to make minor corrections on March 27, 1990. On June 19, 1990, the Trustee filed further amendments to the Disclosure Statement (Documents # 200, 201, 232). After a hearing on the Disclosure Statement held July 2, 1990, and consideration of the objections to the statement, I directed the Trustee to file additional amendments to the Disclosure Statement not later than July 16, 1990, which the Trustee filed July 10, 1989 (Document # 242).

To this point the Board had not filed a liquidation plan as it had previously represented in May 1989 it would do. I therefore ordered the Board to do so, if it desired, not later than July 30, 1990, so that the two competing plans could be assessed by creditors and a final decision whether to continue business or liquidate could be made. On August 1, 1990, Mr. Harold Zell, Chairman of the Board of Directors of Debtor, filed a Disclosure Statement and Plan (Documents # 244, 245). It was withdrawn on August 17, 1990.

On July 26, 1990, a Motion was filed by Harold Zell to remove the Trustee. A hearing was held on the Motion on October 11, 1990, at which time Zell alleged that the Trustee had showed favoritism to Bledsoe. Zell cited deficiencies in the Disclosure Statement which did not accurately represent Bledsoe's claims against Concrete Products and alleged an unreasonably favorable employment contract in favor of Bledsoe. In my order entered November 2, 1990, I stated that I could not find any misconduct by the Trustee. I also found the employment contract to be part of a reasonable reorganization plan and could not find any evidence of favoritism toward Bledsoe. Therefore, I concluded that the Movant failed to show favoritism or negligence which would support the Trustee's removal "for cause." I also concluded that an action for damages was inappropriate as the Trustee had absolute immunity to the extent that this Court ruled on the Trustee's various actions. I therefore denied the Motion to Remove the Trustee.

However, between the filing of the Motion to Remove the Trustee and the hearing, the company's operations had sustained large losses. As a result of these losses the Trustee had notified the Court by letter dated August 27, 1990, (Exhibit D–9) that he intended to cease production and liquidate the business. I therefore concluded that the purpose for the Trustee's services no longer existed as the Board was to reassume management and begin liquidation proceedings. As a result, the Trustee was excused from any further responsibilities in the case (Document # 340).

Walker's first interim application for fees was filed over a year after his initial appointment on May 14, 1990, and amended on December 10, 1990. It was scheduled for a hearing in Brunswick on January 9, 1991. Following opening statements of counsel at that hearing I conducted a lengthy settlement conference with the parties and at that point there seemed a reasonable likelihood that a resolution might be reached which was satisfactory to all parties. As a result no further proceedings were scheduled for several months while negotiations proceeded. Apparently these negotiations broke down in the late summer or in the fall of 1991. On October 23, 1991, the Trustee amended his interim application to include additional services rendered following the date of the

first application and thus rendered it a final application. The hearing to consider said application was sent by notice of this Court dated October 30, 1991, which provided that objections to the Trustee's application would be considered on December 4, 1991. On November 25, 1991, a response to the Trustee's application was jointly filed by three unsecured creditors objecting to the amounts sought. On November 26, 1991, the Debtor filed a Motion to Surcharge the Trustee and an Objection to the Trustee's application. On the same date Debtor amended its previous objections to the Trustee's attorney's fee application. On November 27, 1991, the United States Trustee filed responses asserting no objection to either the Trustee's compensation or the attorney's fee application.

*Matter of Concrete Products, Inc.*, Ch.11 Case No. 88–20540, slip op. at 3–7 (Bankr. S.D.Ga. Feb. 7, 1992) (Davis, J.) (footnotes omitted). Hearings on the Trustee's application were conducted over three days and resulted in an award to Mr. Walker in the amount of $3,582.00 for services rendered as a trustee, $44,640.00 in attorney's fees, and $6,753.66 reimbursement of expenses advanced for a total award of $54,975.66. Mr. Walker's final application had sought $71,547.07 for services rendered as a trustee, $50,130.00 in attorney's fees, and $7,166.01 reimbursement of expenses advanced for services as Trustee, for a total fee request of $128,843.08.[3]

Of the 607.7 total hours for which Mr. Pipkin now seeks compensation, he spent approximately 191 hours contesting Trustee's fee application from start to finish. Of that, approximately 88.80 hours were expended prior to the entry of this Court's Order; 33.80 hours were devoted to appellate work at the District Court level; and 68.50 hours were spent prosecuting the appeal to the Eleventh Circuit Court of Appeals. The U.S.

Trustee objects primarily to the appellate work that Mr. Pipkin performed which totals 102.30 hours or approximately one-sixth of the total hours spent in Debtor's employment. The U.S. Trustee contends that since the District Court affirmed this Court's Order and that Mr. Pipkin, on behalf of the Debtor, appealed that decision to the. Eleventh Circuit Court of Appeals which affirmed in a *per curiam* opinion, the appellate work did not confer any benefit upon the estate; therefore, it is not compensable under applicable law.

In response, Mr. Pipkin contends that the amount of time spent on appellate work should be compensated because at the time he believed that the appeal would be successful. If it had, he argues that additional funds would have been made available for distribution to creditors and that hindsight should not now be employed to examine the unsuccessful appeal and disallow the fee award. Pipkin characterized his position, in essence, as consisting of the belief that the Debtor had a legal right to appeal the decision, and was entitled to its day in court to seek appellate review. Basically, he and others connected with the company felt that "what had been done in the case was wrong." The U.S. Trustee and B.E. Bledsoe's counsel, Mr. Dillard, do not dispute that a party has a right to appeal; rather they question whether it was an exercise of sound judgment to expend such a large amount of time in seeking review of an order in which the trial court is vested with broad discretion and which decision, in fact, was affirmed on all points. Mr. Dillard further argued that a consideration of the likelihood of reversal of an order on appeal must be part of the equation in determining the advisability of pursuing an appeal, in other words, that the decision to prosecute an appeal requires business judgment, as well as legal analysis.

In support of their position, both the U.S. Trustee and Dillard cite the settlement dis-

---

**3.** The reduction in the amount which the Trustee requested was due largely to Trustee's failure to keep time records while performing his duties as a trustee. During the course of his employment, Trustee mistakenly believed that the Bankruptcy Code only required a Trustee to keep records of time spent on legal matters. In light of the Trustee's failure to establish the amount of time spent devoted to trustee's duties beyond 119.4 hours, I only approved compensation for duties performed as a trustee in the amount of $3,582.00.

cussions which as reflected in my February 7, 1992, Order ensued over a period of several months and developed to a stage where the case could have been settled, potentially avoiding all of the fee-application litigation. On this point, Harold Zell testified that during the period of negotiations, and before the series of hearings at the trial level, Mr. Walker had offered to settle for a figure in the range of $50,000.00 and that Mr. Zell had been willing to pay approximately $25,000.00. He also testified that he believed there was correspondence reflecting those and perhaps subsequent offers. The record was left open for Mr. Zell to provide copies of those letters, which have not been received and, therefore, I assume could not be located.

### CONCLUSIONS OF LAW

11 U.S.C. Section 327(a) provides in relevant part:

> (a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. Section 330(a) provides in relevant part:

> (a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—
>
> (1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and
>
> (2) reimbursement for actual, necessary expenses.

In establishing "reasonable compensation" under Section 330 the decision of *Norman v. The Housing Authority of the City of Montgomery*, 836 F.2d 1292 (11th Cir.1988) is the seminal case. In that decision the Eleventh Circuit Court of Appeals concluded that controlling precedent of the United States Supreme Court compelled the Court to approach the setting of attorneys' fees differently than had previously been the case under the authority of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). The twelve factors under *Johnson*, derived from the ABA Code of Professional Responsibility of 1980 in determining an appropriate fee for an attorney to charge, which previously had been applied as the law in the Eleventh Circuit were supplanted by the lodestar analysis set forth in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). As *Norman* instructs, the lodestar is determined by multiplying the number of hours reasonably devoted to the task by a reasonable hourly rate. The Court made it clear, however, that the *Johnson* factors may be considered in setting the reasonable hourly rate which it defined as being "the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Id.* at 1299. Indeed, results obtained are specifically included as a factor in setting the hourly rate. *See Gilmere v. City of Atlanta, Georgia, R.C.*, 864 F.2d 734 (11th Cir.1989).

In determining the number of reasonable hours expended the Court ruled that "excessive, redundant or otherwise unnecessary hours" should be excluded from the amount claimed. *See Norman*, 836 F.2d at 1301. In other words, fee applicants must exercise "billing judgment."

Excluding excessive or otherwise unnecessary hours under the rubric of "billing judgment" means that a lawyer may not be compensated for hours spent on activities for which he would not bill a client of means who was seriously intent on vindicating similar rights, recognizing that in the private sector the economically rational person engages in some cost benefit analysis.

*Id.* at 1301. Moreover, the Court held that,

... in determining reasonable hours the district court must deduct time spent on discrete and unsuccessful claims.

*Id.* at 1302. *See also Perkins v. Mobile Housing Bd.,* 847 F.2d 735 (11th Cir.1988); *Resolution Trust Corporation v. Hallmark Builders, Inc.,* 996 F.2d 1144 (11th Cir.1993). Next, the trial court must make adjustments based on results obtained. *Id.* at 1150. Only if the result is excellent should the entire fee be awarded. "If the result was partial or limited success, then the lodestar must be reduced to an amount that is not excessive." *Norman,* 836 F.2d at 1302; *See Matter of Trinity Industries, Inc.,* 876 F.2d 1485, 1495 (11th Cir.1989). Furthermore, the Court of Appeals made it clear that when claims for fees seem excessive or are supported by inadequate fee applications, a court, sitting as an expert, may draw on its own knowledge and experience concerning reasonable and proper fees and form an independent judgment with or without the aid of witnesses as to value. *See Norman,* 836 F.2d at 1303.

Under *Norman* an evidentiary hearing is not necessary every time there is a dispute over a fee and the Court observed that a request for attorneys' fees should not result in a second major litigation. *Id.* Finally, the trial court has wide discretion in exercising its judgment. *See In re Beverly Mfg. Corp.,* 841 F.2d 365 (11th Cir.1988), and review of fee awards is made on an abuse of discretion standard. *See Gilmere,* 864 F.2d at 742. However, the award must be supported by more than conclusory statements and the court's reasoning needs to be articulated in a manner to allow meaningful review. *See*

*Norman,* 836 F.2d at 1304. Nevertheless, an hour-by-hour review is not mandatory. Proportionate reductions are permissible. *See Id.* at 1302; *Loranger v. Stierheim,* 10 F.3d 776, 783 (11th Cir.1994) (court may make across the board percentage reductions, but must provide a concise but clear explanation of its reasons for the reduction). Although *Norman* was a civil rights case, subsequent decisions have applied the *Norman* analysis in bankruptcy cases. *See In re General Plastics Corp.,* 184 B.R. 1008, 1014 (Bankr. S.D.Fla.1995); *Matter of River Landings, Inc.* 180 B.R. 701, 704 (Bankr.S.D.Ga.1995); *In re Colombian Coffee Co., Inc.,* 88 B.R. 409 (Bankr.S.D.Fla.1988); *In re Wells,* 87 B.R. 732 (Bankr.N.D.Ga.1988). *See generally In re First Colonial Corp. of America,* 544 F.2d 1291, 1299 (5th Cir.1977).

Mr. Pipkin seeks compensation for his services at rates ranging from $85.00 to $125.00 per hour which apparently were his usual and customary rates for various times between 1990 and 1995. I am familiar with the qualifications, experience, skill, and reputation of Mr. Pipkin as well as the usual and customary rates in the relevant legal community and find that the rates that he seeks to charge are within the range of the prevailing market rate for comparable services. Mr. Pipkin has testified, and his testimony is uncontradicted, that he actually devoted the hours to this case which are revealed in the application. Therefore, the 102.30 hours for which he seeks compensation for appellate work were actually expended. The only question then is whether those hours devoted to the prosecution of the appeal of this Court's fee award in favor of Mr. Walker were "necessary services" within the meaning of applicable authority.

In consideration of the foregoing authorities, I conclude that it was not both reasonable and necessary to devote 102.30 hours to the appeal of this Court's February 7, 1992 decision. Certainly with the benefit of hindsight the Debtor can demonstrate absolutely no benefit to the estate in pursuing either appeal; however, the test is not a pure

outcome or benefit conferred test. Instead, a court must determine whether at the time the attorney performed the services were they reasonably likely to benefit the debtor. *See In re Ames Department Stores, Inc.,* 76 F.3d 66, 72 (2nd Cir.1996); *Matter of Taxman Clothing Co.,* 49 F.3d 310, 315 (7th Cir.1995).

I have considered the basis articulated by Mr. Pipkin for prosecuting the appeal. I have also considered the long, acrimonious history of this case. I have considered that counsel undertook to devote over 100 hours on appellate work to challenge a fee award in which the trial court is granted broad discretion and which could have been settled, not only prior to the appeals, *but prior to the trial,* for less than the amount of the eventual award. All of these factors suggest strongly that none of the appellate work should be compensated. *Norman* and subsequent cases clearly hold that excessive, redundant or unnecessary hours should be excluded and the court *must* deduct for time spent on discrete and unsuccessful claims. *See Loranger,* 10 F.3d at 782; *Resolution Trust Corporation,* 996 F.2d at 1149; *Matter of Trinity Industries, Inc.,* 876 F.2d at 1495; *Perkins,* 847 F.2d at 738. In the abstract this would appear to call for total disallowance of the time spent on appellate work. The result is not that clear-cut, however. As *Schumann* holds, Section 330 is not the "usual" sort of fee-shifting statute in that it contains no "prevailing party" provision. *See Grant v. George Schumann Tire & Battery Co.,* 908 F.2d 874 (11th Cir.1990).

> While a debtor or creditor may prevail in one or more of the many disputes which arise in the course of a typical Chapter 11 reorganization, almost everyone loses something.... The language of § 330 does not authorize the court to award attorney's fees to the prevailing party. Rather the statute authorizes the court to award "reasonable compensation" for actual, necessary services rendered....

> *Id.* at 882. *See Port Royal Land & Timber Company v. Berkowitz, Lefkovits, Isom, Kushner,* 924 F.2d 208 (11th Cir.1991) (holding that bankruptcy court erred by not awarding fees for unsuccessful litigation even though the effort was found to have been actually made, reasonable, and necessary to the faithful representation of the bankruptcy estate).

> Although it has been recognized that the lodestar approach may be problematic in bankruptcy cases where the attorneys may expend hours for which there is no accurate measure of success or failure, the approach remains applicable in the bankruptcy context.

*Schumann,* 908 F.2d at 879, n. 11.

In so holding, *Port Royal* and *Schumann* recognize that a trustee or debtor-in-possession, and its counsel, have many statutory duties, the performance of which are mandatory to the administration of a bankruptcy estate, but which nevertheless may not yield a specific monetary recovery.[4] Debtors' counsel in Chapter 11 cases are not insurers of a successful reorganization and may be entitled to reasonable compensation even in a failed case. *See Matters of Coastal Nursing Center, Inc., and Tybee Island Nursing Center, Inc.,* Ch. 11 Cases No. 93–40898 & 93–40899, slip op. at 5–9 (Bankr. S.D.Ga., Oct. 10, 1993) (Davis, J.). Nevertheless, where a debtor litigates distinct and separate claims within a Chapter 11 case, compensation is still dependent on whether the services were reasonable and necessary, which includes the factor of results obtained. *See Resolution Trust Corporation,* 996 F.2d at 1150 (holding that a court first should determined the reasonable hours and rate and then it may adjust the lodestar if the prevailing party was not completely successful in its efforts). Thus, while good faith, unsuccessful litigation will not go uncompensated, unsuccessful results necessitate reduction of the lodestar amount.

---

**4.** For example, some of these duties include investigating potential fraudulent transfers or preferential payments, examining the claims of credi- tors, and furnishing information to parties in interest. *See* 11 U.S.C. §§ 1107, 1106, and 704.

■ While Pipkin's work at the trial stage has not been challenged, it is noteworthy that he spent over 88 hours at this stage only to have a fee award totalling $54,975.66 when the settlement range, prior to trial, was between $25,000.00 and $50,000.00. In the totality of this case, I am not prepared to disallow or reduce this portion of his fee request. The Court did substantially reduce Mr. Walker's fee request, although largely for reasons never advanced by Mr. Pipkin[5] In hindsight, the decision not to settle appears flawed, yet the amount that would have been paid was still substantial and I cannot conclude that, at the time his work was performed, there was not a good faith determination that the trial work was reasonably likely to provide a benefit to the Debtor. The appellate stage presents a different picture.

■ First, I hold that Mr. Pipkin's compensation for appellate work should not be denied *in toto*. However, because fee awards are reviewed by an abuse of discretion standard, if an appeal fails, counsel seeking such an award bears a heavier burden of showing the necessity and reasonableness of such activities than, for example, the burden of showing reasonable necessity for similar work at the trial level.

With regard to the appeal of this Court's ruling on Walker's fees, 33.80 hours were devoted to the first appeal to the United States District Court and 68.50 hours to appeal to the Eleventh Circuit Court of Appeals. Both were singularly unsuccessful at an additional cost to the estate of $12,787.50. As to the first appeal, it is highly doubtful, in light of the abuse of discretion standard, the already substantially reduced fee award, and the settlement value of the case whether a

private client would have funded an appeal. Yet for a trial judge to completely disallow fees for a first appeal borders on the self-serving. Mr. Pipkin and his client held a strong belief that the decision was flawed and the right of appellate review is one I am reluctant to effectively circumscribe by placing counsel financially at risk when an appeal fails. Nevertheless, in light of the outcome, I hold that a reduction, but not total disallowance, of the fee award is appropriate under the circumstances, as mandated under *Norman* and other applicable cases. This portion of the fee request, 33.80 hours devoted to Debtor's first appeal to the United States District Court, will be reduced by fifty percent.

■ The continued pursuit of Debtor's and Pipkin's quest for vindication to the Eleventh Circuit Court of Appeals is even more questionable. At this stage counsel already had expended a total of 122.60 hours or approximately $15,325.00 challenging the award. Counsel could have previously settled the case for less than the amount of the eventual award, avoiding most, if not all, of these expenses.[6] On appeal the District Court had affirmed this court on all grounds. Yet Mr. Pipkin and the Debtor decided to devote another 68.50 hours or $8,562.50 to an additional appeal. At this point, counsel, or his client, or both, totally failed to exercise appropriate billing judgment and the necessary cost benefit analysis prior to pursuing the appeal. *See Norman*, 836 F.2d at 1301. Certainly by now the fee award dispute had crossed the line into "second major litigation" as disapproved by *Norman*.[7] The decision to seek further review of an order in which the trial court has wide discretion at a potential cost of over $8,500.00, given the objective

---

**5.** *See Matter of Concrete Products, Inc.*, Ch. 11 Case No. 88–20540, slip op. at 58–66 (Bankr. S.D.Ga., Feb. 7, 1992) (Davis, J.); *Id.* at 43–44.

**6.** It is noteworthy that only one time entry, on April 25, 1991, makes any reference to discussion of "settlement issues." There is no evidence of any effort to reach a compromise on the eve of trial during November 1991, or at any time while the two appeals were pending.

**7.** This is clear from the application which reveals a total of 607 hours of work of which 191 or nearly 30% were devoted to the fee award litigation. While this issue was important, it cannot be said to have reasonably commanded such a heavy proportion of counsel's time in light of varied, complex, and voluminous issues counsel handled over the past five years.

prospects for reversal, the settlement value of the case, and the fact that every dollar spent would come out of the pockets of priority tax or unsecured claimants was both unreasonable at the time and unlikely to confer a benefit upon the estate.

The entire fee application litigation reveals little dispassionate analysis by debtor and its counsel; the second appeal constituted a complete lapse in judgment. It did not reflect a cost/benefit analysis by an economically rational person. *Id.* at 1301. It was not the product of application of legal skill to the facts as they then existed. As *Norman* observed:

> [L]egal skill has no intrinsic value unless it is used to further the client's interest, which is to obtain a just result quickly and economically.

> At the beginning of a case skill is manifest in the kind of judgment shown in case assessment. This is evidenced by efforts where feasible to seek dispute resolution without litigation, or, if litigation appears necessary, by the decisions on theories to be included and parties to be sued.

> From the beginning and throughout a case, expertise in negotiations and tactics often advances a client's cause more quickly and effectively than the sustained and methodical trench warfare of the classical litigation model.

*Id.* at 1301. When Mr. Pipkin and his client opted for continuing the "trench warfare" they did so at the risk that the effort would go uncompensated.[8]

Accordingly, the objection of the United States Trustee is overruled in part and sustained in part as follows:

| | |
|---|---|
| Total Fee Request | $62,625.50 |
| Less 5.6 hours (see footnote 2 at page 5) | 700.00 |
| Less 50% for first appeal (33.80 hours at $125.00) | 2,112.50 |
| Less 68.50 hours for second appeal at $125.00 | 8,562.50 |
| **TOTAL** | $51,250.50 |

IT IS SO ORDERED.

---

**8.** Although Pipkin's application adequately satisfied Bankruptcy Rule 2016's requirement to keep detailed records of services rendered, time expended, and expenses incurred, Pipkin failed to *explain how each hourly rate applied to the six enumerated projects.* Because it is the applicant who possesses the burden to justify his fees, this Court will presume that Mr. Pipkin charged the $125 rate for the services that are disputed by the United States Trustee.